# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### Southern Division

TROY WILLIAM TINGLEY

        Plaintiff,

Case No.  1:20-cv-00094

Vs

Honorable Janet T. Neff

Magistrate Salley J. Berens

STATE OF MIGHIGAN, et al

        Defendants

---

| | |
|---|---|
| CHRISTOPHER M. WIRTH (P70174) | NEIL A. GIOVANATTI (P82305) |
| *Attorney for Plaintiff* | Cassandra Drysdale-Crown (P64108) |
| CORE LEGAL PLC | Assistant Attorneys General |
| 250 Monroe Avenue NW, Suite 400 | *Attorneys for State Defendants* |
| Grand Rapids, MI 49503 | Health, Education, & Family Service |
| D:  (616) 855-2145 | Division |
| F:   (616) 879-0400 | PO Box 30758 |
| CWirth@CoreLegalPLC.com | Lansing, MI 48909 |
| | (517) 335-7603 |
| | giovanattin@michigan.gov |
| DAN E. BYLENGA (P32154) | drsydalecrown@michigan.gov |
| *Attorneys for YWCA Defendants* | |
| Chase Bylenga Hulst PC | |
| 25 Division Ave S Ste 500 | NICOLE LUSTER |
| Grand Rapids, MI 49503 | Defendant |
| (616) 608-3061 | *Pro Se* |
| dan@chasebylenga.com | |
| | CINDY L. SHACKLETON |
| | Defendant |
| | *Pro Se* |

---

## AMENDED COMPLAINT AND JURY DEMAND

---

# COMPLAINT

Plaintiff states:

## JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983 and 42 U.S.C. § 1985. Jurisdiction is conferred by 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. All of the parties are, or at all relevant times were, located in the State of Michigan and within the Federal Court's Western District of Michigan, Southern Division. The acts complained of arose in the Western District of Michigan, in the counties of Kent and Ingham. Venue in the Western District, Southern Division is proper pursuant to 28 U.S.C. § 1391 and local court rule.

## PLAINTIFF

3. Plaintiff TROY WILLIAM TINGLEY is the legal parent of two minor children and a United States citizen residing in the Township of Ada, Michigan, County of Kent.

4. Plaintiff is the legal father of a son (date of birth 07/08/2003) and a daughter (date of birth 05/08/2007).

5. Plaintiff and the children's mother divorced in 2010 and are subject to custody, parenting time and child support orders regarding these children in Case Number 13-05831-DM, 17th Circuit Court for the County of Kent, before the Honorable Kathleen Feeney (the "Custody Case").

6. At all times relevant to this lawsuit, Plaintiff and the children's mother have shared joint custody of the children, and Plaintiff has had an order of parenting time pursuant to which the children were in his care approximately 40-percent of the time.

7.  For the past two years, Plaintiff's son has been in his care 100-percent of the time following yet another instance of assault between the child and the child's mother.

8.  Plaintiff was deprived of his rights, privileges or immunities secured by the Constitution or laws of the United States, or the State of Michigan, due to the conduct of the Defendants.

9.  Plaintiff had and has a fundamental, Constitutional right to make decisions concerning the care, custody, and control of his children. *Meyer v Nebraska*, 262 US 390, 399-400; 43 S Ct 625; 67 L Ed 1042 (1923). The right to parent one's children is "essential to the orderly pursuit of happiness by free men," *Id* at 399, and "is perhaps the oldest of the fundamental liberty interests," *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000).  The right is an expression of the importance of the familial relationship and "stems from the emotional attachments that derive from the intimacy of daily association" between child and parent. *Smith v Org of Foster Families for Equality & Reform*, 431 US 816, 844; 97 S Ct 2094; 53 L Ed 2d 14 (1977)."

10. Further Plaintiff had and has a fundamental, Constitutional right to free speech and assembly. U.S. Const. amend. 1.

11. Plaintiff had and has a fundamental, Constitutional right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the Fourteenth Amendment.  U.S. Const. amend. 14.

12. Plaintiff was deprived of all of the foregoing rights by Defendants.

13. Plaintiff was deprived by Defendants of his rights protected in the procedural and substantive components of the Due Process Clause of the Fourteenth Amendment.

## **DEFENDANTS**

14. The term "Defendant" or "Defendants" refers to all Defendants named herein, jointly and severally, unless otherwise stated.

15. Upon information and belief, each of the Defendants are responsible, gross negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused or continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing injury, or acting in concert, or in some other actionable manner.

16. The Michigan Department of Health and Human Services ("MDHHS") is the subdivision of the State of Michigan tasked with assuring that all services and programs provided through the Michigan Children Service's Agency specifically, and child welfare in Michigan generally, operate in conformity with constitutional, statutory, and regulatory requirements. MDHHS is not named a defendant by Plaintiff.

17. The Kent County Department of Health and Human Services (Kent County – MDHHS) is a political subdivision of MDHHS tasked with assuring that all services and programs provided through MDHHS within Kent County operate in conformity with constitutional, statutory, and regulatory requirements. Kent County – MDHHS is not named a defendant by Plaintiff.

18. Michigan's Statewide Automated Child Welfare Information System (MiSACWIS) is the computer system that MDHHS employees use to track child welfare cases in the State of Michigan. MiSACWIS is not named a defendant by Plaintiff.

19. Defendant ROBERT GORDON is or was the Director of MDHHS and is sued in his personal and official capacity. Director Gordon is or was responsible for administering all MDHHS programs, including the direct selection, development and oversight of MiSACWIS, and assuring that all services and programs operate in conformity with constitutional, statutory, and regulatory requirements. Director Gordon maintains or maintained his principal office at the MDHHS, 235 S. Grand Avenue, Lansing, Michigan 48909, County of Ingham.

20. Defendant HERMAN McCALL is or was the Executive Director of the Michigan Children's Services Agency. Dr. McCall is sued in his personal and official capacity. Dr. McCall reports or reported directly to the director of MDHHS and has or had overall operational responsibility for Michigan's Children's Services Agency, including the direct selection, development and oversight of MiSACWIS. Dr. McCall maintains or maintained his principal office at the MDHHS, 235 S. Grand Avenue, Lansing, Michigan 48909, County of Ingham.

21. Defendant JOOYEUN CHANG is the senior deputy director of the Children's Services Agency at the Michigan Department of Health and Human Services. Deputy Director Chang is sued in her personal and official capacity. Deputy Director Chang reports directly to the executive director of MDHHS and has overall operational responsibility for Michigan's Children's Services Agency, including the direct selection, development and oversight of MiSACWIS. Deputy Director Chang maintains her principal office at the MDHHS, 235 S. Grand Avenue, Lansing, Michigan 48909, County of Ingham.

22. Defendant TRACEY FOUNTAIN is or was the Director of Kent County - MDHHS. Director Fountain is sued in her personal and official capacity. Director Fountain reports directly to Deputy Director Chang and has overall operational responsibility for Kent County – MDHHS. Director Fountain maintains her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

23. Defendant SAVATOR SELDEN-JOHNSON is or was the Child Welfare Director for Kent County - MDHHS. Director Selden-Johnson is sued in her individual and official capacity. Director Selden-Johnson reports directly to Director Fountain and has day-to-day management responsibility for Kent County – MDHHS Child Welfare. Director Selden-Johnson maintains her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

24. Defendant SCOTT ORR is Supervisor of Child Protective Services for Kent County – MDHHS. Supervisor Orr is sued in his individual and official capacity. Supervisor Orr reports directly to Director Selden-Johnson and has day-to-day supervision responsibility for the Child Protective Services division of the Kent County – MDHHS. Supervisor Orr maintains his principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

25. Defendant NYELA BOLDEN is or was a Kent County – MDHHS Child Protective Services Ongoing Supervisor. Supervisor Bolden is sued in her individual and official capacity. Supervisor Bolden reports directly to Supervisor Orr and is or was a supervisor responsible for the supervision of Defendant Daniel Kuchan. Supervisor

Bolden maintained her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

26. Defendant JEREMY NOVOSAD is a Kent County – MDHHS Child Protective Services Ongoing Supervisor. Supervisor Novosad is sued in his individual and official capacity. Supervisor Novosad reports directly to Supervisor Orr and is or was a supervisor responsible for the supervision of Defendant Daniel Kuchan. Supervisor Novosad maintains his principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

27. Defendant MATT KUZMA is a Kent County – MDHHS Child Protective Services Ongoing Supervisor. Supervisor Kuzma is sued in his individual and official capacity. Supervisor Kuzma reports directly to Supervisor Orr and is or was a supervisor who was directly responsible for the supervision of Defendant Nicole Luster. Supervisor Kuzma maintains his principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

28. Defendant CINDY L. SHACKLETON is or was a Kent County – MDHHS Child Protective Services Ongoing Supervisor. Supervisor Shackleton is sued in her individual and official capacity. Supervisor Shackleton reports directly to Supervisor Orr and is or was a supervisor who was directly responsible for the supervision of Defendant Nicole Luster. Supervisor Shackleton maintains her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

29. Defendant KERI DESMARAIS is a Kent County – MDHHS Child Protective Services Ongoing Supervisor. Supervisor Desmarais is sued in her individual and official capacity. Supervisor Desmarais reports directly to Supervisor Orr and is or was a

supervisor who was directly responsible for the supervision of Defendants Nicole Luster and Shelbie Williams. Supervisor Desmarais maintains her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

30. Defendant DANIEL KUCHAN is a Child Protective Services caseworker for the Kent County – MDHHS. Mr. Kuchan is sued in his individual and official capacity. Mr. Kuchan was or is a caseworker for Kent County – MDHHS. Mr. Kuchan maintains his principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

31. Defendant NICOLE LUSTER is or was a Child Protective Services caseworker for the Kent County – MDHHS. Ms. Luster is sued in her individual and professional capacity. At all times relevant to this action, Ms. Luster maintained her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

32. Defendant SHELBIE WILLIAMS is a Child Protective Services caseworker for the Kent County – MDHHS. Ms. Williams is sued in her individual and professional capacity. Ms. Williams was or is a caseworker for the Kent County – MDHHS. Ms. Williams maintains her principal office at Kent County – MDHHS, 121 Franklin Street, S.E., Suite 200, Grand Rapids, MI 49507, County of Kent.

33. Defendant YWCA WEST CENTRAL MICHIGAN (YWCA) is an agent and/or contractor of MDHHS or Kent County - MDHHS who acted as its agent in connection with the circumstances of this lawsuit. The YWCA is a non-governmental entity acting under color of law pursuant to its contract with MDHHS or Kent County – MDHHS.

The agent maintains its principal office at 25 Sheldon Boulevard, SE, Grand Rapids, MI 49503, County of Kent.

34. Defendant RUTHIE PAULSON is or was the Safe Connections Program Manager for Defendant YWCA West Central Michigan. Ms. Paulson is sued in her individual and professional capacity. Ms. Paulson maintains her principal office at 25 Sheldon Boulevard, SE, Grand Rapids, MI 49503, County of Kent.

35. Defendant JOHN DOE I represents the employees of the State of Michigan or Kent County who had additional supervisory or professional responsibilities for Defendant Daniel Kuchan but are unknown to Plaintiff at this time. Plaintiff will amend this complaint when such individuals are identified.

36. Defendant JOHN DOE II represents the employees of the State of Michigan or Kent County who had additional supervisory or professional responsibilities for Defendant Nicole Luster but are unknown to Plaintiff at this time. Plaintiff will amend this complaint when such individuals are identified.

37. Defendant JOHN DOE III represents the employees of the State of Michigan or Kent County who had additional supervisory or professional responsibilities for Defendant Shelbie Williams but are unknown to Plaintiff at this time. Plaintiff will amend this complaint when such individuals are identified.

38. Defendant JOHN DOE IV represents all agencies and contractors of the State of Michigan or Kent County who acted as agents of the State of Michigan or Kent County in connection with the circumstances of this lawsuit but are unknown to Plaintiff at this time. Plaintiff will amend this complaint when such individuals are identified.

39. Defendant JOHN DOE V represents the employees of the State of Michigan or Kent County who were executive staff for MDHHS or Kent County – MDHHS at any time relevant to the allegations in this lawsuit but were subsequently replaced when the executive administration transferred from Governor Rick Snyder to Governor Gretchen Whitmer.  Plaintiff will amend this complaint when such individuals are identified.

40. The Defendants acted individually and jointly under color of law to deprive Plaintiff of his civil rights.  Because they acted knowingly, recklessly and in disregard of well-established law, with no objectively reasonable basis for their actions, they do not have qualified immunity from damages under the standards set forth by the United States Supreme Court, the Sixth Circuit and this Court.

41. The Defendants' conduct is an ongoing series of acts and failures to act causing irreparable harm to Plaintiff.

## FACTS

### I.      KCPS involvement.

42. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

43. Plaintiff and the children's mother divorced in 2010 in Oakland County.

44. The Custody Case was transferred to Kent County in 2013.

45. Child Protective Services in Kent County ("KCPS"), a division within Kent County – MDHHS, first opened an investigation involving these children in July 2013 following a complaint that the children's mother was using excessive discipline with their son, then 10-years old.

46. The boy reported that his mother disciplined him by hitting him with a belt.

47. The boy also reported that his mother had tried to suffocate him by forcing his head into a pillow.

48. He reported that he managed to escape his mother by flailing his arms and trying to scratch her.

49. He also reported that his mother took him to his maternal-grandfather's house, where the grandfather used his fist to punch/push him onto the couch and then beat him across the lower back when he got off the couch.

50. The boy also reported witnessing the mother and the grandfather in a verbal and physical altercation while at that house that involved the grandfather grabbing the mother by the arm and the mother hitting and scratching the grandfather.

51. On or about November 22, 2015, the boy reported that he had to lock himself in the bathroom of the mother's home to escape her abuse.

52. She kicked in the door.

53. The boy managed to evade her and then ran away from home.

54. KCPS was made aware of same.

55. On or about November 27, 2015 an investigation was opened by KCPS concerning the mother and the children.

56. The investigation was in response to a disclosure by the boy, then 12-years old, that the mother had physically abused him by repeatedly striking him, including blows to the face.

57. Plaintiff's son was seen for his injuries -- which included bruising to his face, eye and arm -- by urgent care doctor, Linda VandenBosch, M.D. of Spectrum Health in Grand Rapids, Michigan.

58. The boy described to Dr. VandenBosch physical abuse by his mother consistent with his injuries.

59. The boy made such disclosures in the course of his medical treatment.

60. Dr. VandenBosch did not identify any reason to believe his statement was false, coached or coerced, or inconsistent with his presenting injuries.

61. Dr. VandenBosch, as a mandatory reporter, reported to KCPS central intake that the boy had been the victim of non-accidental pediatric abuse.

62. She filed a Form 3200 by fax, which is the form and process used by a physician to report suspected child abuse to MDHHS.

63. Dr. VandenBosch testified to the foregoing allegations 57 through 62 in her testimony in the Custody Case.

64. Well established MDHHS investigative policy requires that MDHHS employees make contact with a reporting physician as the reporting individual.

65. No one from MDHHS has ever spoken with Dr. VandenBosch regarding the boy's injuries or his disclosure about the abuse from his mother.

66. When a report of suspected child abuse is received by MDHHS, the investigation is generally referred to an on-call investigator because MDHHS is required to make contact with the alleged victim within 24-hours.

67. The ongoing investigation is then transferred from the on-call worker to the investigator who is assigned to the case.

68. KCPS investigator Kaley Dzwonkowski was the initial on-call investigator who responded to Dr. VandenBosch's report of child abuse.

69. Ms. Dzwonkowski spoke with the victim (Plaintiff's son) and his sister (Plaintiff's daughter).

70. Ms. Dzwonkowski reported after meeting face-to-face with Plaintiff's son that:

*"Various facial bruises were observed and were photographed. There was a bruise on his left cheek, a bruise under his right eye and a slight bruise/bump on his forehead. There was also a bruise on each arm. [The boy] was able to demonstrate an understanding of the forensic rule protocol through answering a series of sample questions correctly…[the boy] stated that the rules at his mom's house are that he has to listen and he cannot be on the iphone after 9:30. If he breaks the rules his mom will hit him by punching, smacking or kicking him and the only time he feels safe at home is when he has company, however, after his company leaves, he has no idea what his mom is going to do with him…"*

*"When asked allegation specific questions, [the boy] reported that on Thanksgiving he and his sister and mom were planning on going to his maternal aunt's home and were waiting on their mom to finish getting ready and he and [his sister] were play-fighting. [His sister] hit him relatively hard and he started chasing after her. His mom got mad and started chasing after him because she thought he was going to hit her. [The boy] indicated that he jumped into his bed to keep himself safe and as he was jumping in the bed he hit his cheek on the bed post and then hid under the sheets and closed his eyes while his mom started beating on him. [The boy] stated that his mom told him to stay in his room and he and his sister started arguing again and his mom came at him again and he jumped back into bed and she was trapping him under his sheets. [The boy] stated that when he finally lifted his head up, his mom hit him in the eye with the bottom of her palm and his vision got blurry and she kept hitting and kicking him until she finally stopped. [The boy] stated that when they got to his aunt's house, his mom blamed everything on him and stated that he lost control and she was trying to calm him down."*

*"[The boy] stated that his mom has attacked him in the past and it will sometimes happen out of nowhere. [The boy] reported that he is scared about her finding out that he told because his punishment generally gets worse whenever she finds out that he has told someone what she does to him. [The boy] indicated that he can sometimes speak with the school counselor [redacted], but his mom hit him the last time [the school counselor] called her. [The boy] stated his mom will also hit his sister, but not as often and not as hard. [The boy] reported that this past Sunday, his mom told him that she was going to 'cut his throat and no one would know he was dead and she would let him slowly bleed out' so he got scared and ran away to a neighbor down the street to call his dad. His dad did not answer the phone so he went back home and his* [sic] *[the boy] reported that the only person he feels safe with is his dad."*

71. Ms. Dzwonkowski reported after meeting face-to-face with the sister that:

*"...[the sister] was able to demonstrate an understanding of the forensic rule protocol through answering a series of sample questions correctly...[The sister] reported that she did not know what she liked about her mom and dislikes when her mom hits them, calls them names and flips them off. [The sister] stated that her favorite thing about her dad is that he never spanks her or her brother and she does not have anything she dislikes about him. [The sister] reported that at her mom's house she has to treat her with respect and she is not allowed to fight and when she gets in trouble, her mom will hurt her/spank her with her hand, belt or back of the brush, and/or call her names (fucker, motherfucker, bitch, cunt and asshole)."*

*"[The sister] stated that at her dad's she just has to respect him, do her chores and do her homework and if she breaks a rule her dad will only yell."*

*"When asked investigation specific questions, [The sister] stated that she accidentally hit [the boy] while they were play fighting and he started chasing her. Her mom ran after him because she thought that he was going to hurt her and he ran upstairs to his room and she ran into her mom's room. [The sister] reported that [the boy] started covering his face and their mom kept hitting him. [The sister] indicated that [the boy] told their family what happened and their mom lied and blamed everything on him. [The sister] reported that their mom lies a lot and she has hit her before and left marks. [The sister] stated that she tells her dad whenever this happens and only feels safe at his house."*

72. The investigation was transferred from Ms. Dzwonkowski to Defendant Daniel Kuchan on or about November 30, 2015.

73. Ms. Dzwonkowski had the investigation for less than 72-hours and managed to interview both children.

74. Defendant Kuchan, and his supervisor Defendant Nyela Bolden, had the investigation for more than 3-months but never spoke with Dr. VandenBosch.

75. Defendant Kuchan testified in the Custody Case that "the bare minimum" for his job responsibilities when conducting an investigation is to interview collateral contacts.

76. Defendant Kuchan did not meet "the bare minimum".

77. Defendant Kuchan testified that the reason he was not diligent in contacting Dr. VandenBosch was because *"...she's not Dr. Simms of the Child Protection Team who can provide any forensic knowledge about [the boy's] injuries that occurred."*

78. MDHHS policy specifically provides for a forensic child abuse medical exam when physical abuse is suspected.

79. Dr. N. Debra Simms at the Helen Devos Children's Hospital is the primary pediatric forensic child abuse expert that is used by KCPS for such exams.

80. Defendants Kuchan and Bolden never made the referral for a forensic child abuse medical exam.

81. Defendant Kuchan and Bolden never sought consent from the parents to conduct a forensic child abuse medical exam.

82. But Defendant Kuchan contacted the child's general pediatrician, Dr. Ellen Kruggel.

83. Dr. Kruggel is not a forensic pediatric abuse specialist like Dr. Simms.

84. Dr. Kruggel did not examine the boy at any time relevant to his injuries like Dr. VandenBosch had done.

85. Dr. Kruggel was not qualified to opine on the boy's injuries, which she never saw.

86. Nevertheless, Dr. Kruggel had noted in the boy's medical charts on September 29, 2015 (less than two months before the investigation) that the boy reported to her being afraid of the physical punishment he gets at the mother's house.

87. Defendants Kuchan and Bolden ignored that report, and made no mention of the boy's concerns in their investigation.

88. Defendants Kuchan and Bolden were not qualified to opine on the boy's injuries.

89. Defendants Kuchan and Bolden never made contact with Officer Schaaf of the Kentwood Police Department.

90. Officer Schaaf was the first law enforcement office to interview the boy, and had a video recording of the interview.

91. Defendants Kuchan and Bolden never spoke with Officer Schaaf and never reviewed the video.

92. Defendant Kuchan, together with a detective from the Kentwood Police Department, interviewed Plaintiff's son at his school on December 1, 2015.

93. Defendant Kuchan's report of the boy's statements is identical to his disclosures to Ms. Dzwonkowski.

94. The boy told Defendant Kuchan that he told his maternal family that his mother had caused his injuries but that his mother told everyone that he and his sister were just fooling around.

95. None of the maternal family were present when the abuse occurred.

96. Nevertheless, Defendant Kuchan took the time to interview each member of the maternal family – but not Dr. VandenBosch and not Officer Schaaf.

97. On December 3, 2015, Defendant Kuchan, together again with the detective, interviewed Plaintiff's daughter at her school.

98. Defendant Kuchan's report of the girl's statements is identical to her disclosures to Ms. Dzwonkowski.

99. Defendant Kuchan testified in the Custody Case as follows:

| | |
|---|---|
| *Question from Counsel:.* | *As part of your job responsibilities, do you document the contacts that you have with the parties, children, and any collateral contacts?* |
| *Answer from Kuchan:* | *Yes.* |
| *Q:* | *And is that done contemporaneously with the actual contact?* |
| *A:* | *Yes.* |
| *Q:* | *Are your recordkeeping practices consistent with* |

*the [MDHHS] policies?*
A:                          *Yes.*

100.    But in fact, Defendant Kuchan had destroyed all of his notes that he took of those interviews at the time.

101.    He testified to same in the Custody Case 10-months after his original testimony.

102.    MDHHS policy is and was to preserve such notes.

103.    The Model Forensic Interview Protocol ("Forensic Protocol") is the product of the Michigan Governor's Task Force On Child Abuse and Neglect.

104.    The Forensic Protocol also directs keeping notes of forensic interviews with children, giving preference first to video and then audio recordings of such interviews if possible.

105.    It was possible to video or audio record the interviews with the children at their schools.

106.    Defendant Kuchan did not video or audio record the interviews of the children.

107.    During the investigation, Defendant Kuchan listened to a recording of a conversation Plaintiff's daughter had in which she said *"[mom is] saying if [I] do that, I'm going to cut your throat open…That's what she is saying…I'm just scared…That's why I want to stay with you…I don't want you to tell [mom] cause I know it'll get worse…Have you told [mom] about the other stuff…Ok good.*"

108.    Defendant Kuchan and Bolden ignored the girl's concerns.

109.     On December 4, 2015, Defendants Kuchan and Bolden, discussed the case and determined there was no need for the children to be removed from the mother's care, no need for the mother's parenting time with the children to be supervised, and no need for court involvement.

110.     Defendant Kuchan cited "inconsistencies" in the boy's statements as his rationale for not immediately substantiating the mother's abuse.

111.     There were no inconsistencies in the reported statements by Ms. Dzwonkowski, Defendant Kuchan or the detective.

112.     Defendant Kuchan could not have known if there were inconsistencies between the statements made by the child to Dr. VandenBosch or Officer Schaaf because he never spoke with them.

113.     Defendant Kuchan could not have known if there were inconsistencies in the statement video recorded by Officer Schaaf because he never reviewed it.

114.     There were no inconsistencies.

115.     To the extent there were inconsistencies in Defendant Kuchan's method of interviewing the children, no one will ever know because Defendant Kuchan did not video or audio record the interviews, and he destroyed all of his notes of the interviews.

116.     To the extent there were inconsistencies in Defendant Kuchan's summaries of the children's statements, no one will ever know because Defendant Kuchan did not video or audio record the interviews, and he destroyed all of his notes of the interviews.

117.     When Defendants Kuchan and Luster failed to take action, Plaintiff's counsel filed an emergency motion in the Custody Case to protect the children.

118. Defendant Kuchan participated in that hearing via telephone on December 4, 2015.

119. In that hearing, Defendant Kuchan vaguely cited "inconsistencies" that did not exist. He gave no concrete examples.

120. Despite that, the court ordered that the mother provide a list of individuals, at least one of whom must always be present to supervise whenever the children were in her care. That order was not rescinded until April of 2016.

121. The mother was ordered to maintain a log of who was supervising. That order was not rescinded until April of 2016.

122. The mother was further ordered not to the threaten the children and not to speak to the children about court, the investigation, etcetera.

123. She was also ordered to attend the Kent County Assisting Community Family Partnership and Parent Support Partners.

124. Defendants Kuchan and Bolden knew of each of these orders.

125. The mother violated each of those orders.

126. Defendants Kuchan and Bolden knew of those violations.

127. The mother punished the children for their disclosures.

128. The mother manipulated them to recant.

129. The children were then victims in at least three additional KCPS reports of child abuse caused by the mother.

130. Throughout the 2016 investigation of the mother, she was taking the children's Iphones and cell phones away from them.

131.     She did this so the children could not record her physical and verbal abuse, and so the children could not report out to Plaintiff, law enforcement or KCPS.

132.     There were court orders and show causes in the Custody Case related to the mother's tactics of taking the phones away from the children.

133.     The mother called law enforcement three times against the boy during the investigation in order to deflect from her abusive conduct.

134.     There were court orders in the Custody Case prohibiting the mother from calling law enforcement unless it was an actual emergency.

135.     Meanwhile in January 2016, the Kentwood detective submitted the criminal investigation to the prosecuting authority for criminal charges.

136.     The Kent County Prosecutor's Office charged the mother with Child Abuse in the 3rd Degree, a 2-year felony under Michigan Codified Law 750.136b, Michigan Penal Code Act 328 of 1931 § 136b(5) and (6).[1]

137.     On January 13, 2016, the mother received a letter from the prosecutor informing her of the charges.

138.     She again punished the boy for having gotten her in trouble.

139.     The boy called Plaintiff and reported the abuse.

140.     Plaintiff reported the information to Defendant Kuchan.

141.     Defendants Kuchan and Bolden did nothing.

---

[1] The Kent County Prosecutor's Office routinely prosecutes cases of criminal child abuse and domestic assault, even when victims recant.  But, ultimately the prosecutor stipulated to entry of an order of *nolle proseque* dismissing the felony child abuse case against the mother. The explanation provided to Plaintiff by the assistant prosecuting attorney, Kevin Bramble, was that it would be difficult to obtain a criminal jury conviction once defense counsel learned there was a record of Kent County - MDHHS not substantiating by preponderance of the evidence in its investigation of the mother; a lower burden of proof than the beyond a reasonable doubt standard required for the jury to return a criminal conviction.

142.     On or about January 22, 2016, the mother pulled the boy out of school and, alone, took him to Big Rapids.

143.     The mother was still under the December 4th court order that a supervisor be present when she was in contact with the children.

144.     Plaintiff discovered that his son was taken from school by the mother and believed the daughter was also with her.

145.     In fact, the mother had taken only the boy -- presumably to have time alone with him to discuss the criminal charges and secure his recantation.

146.     Plaintiff went to the Kentwood Police Department to ask for assistance on the parenting exchange.

147.     Kentwood Police Department had been involved in several, prior parenting exchanges, so this was not out of the ordinary for these parents.

148.     Meanwhile, the mother drove back to Kentwood and returned the boy to school 10-minutes before the end of the school day.

149.     Plaintiff had no knowledge of the mother's scheme at the time he went to the police department.

150.     While at the police department, Plaintiff received a phone call from the school that the children had not been picked up.

151.     The school attendance parapro, Angela Tweddole, later provided a letter memorializing what occurred next.

152.     The letter stated that while she was on the phone with Plaintiff, the mother walked into the school alone to take the daughter.  Plaintiff asked to speak with the mother, but the mother refused. Plaintiff informed Ms. Tweddole that he was at the

Kentwood Police Department and asked that she convey to the mother to bring the children to him for the exchange. Ms. Tweddole informed the mother of this. The mother then took the children.

153. In fact, the mother did not meet Plaintiff for the exchange at the police department and, instead, fled with the children to Mecosta County.

154. At this point, law enforcement was aware that the mother (a) had pulled the boy out of school during the day; (b) did not meet Plaintiff to exchange the children safely at the police station; (c) was alone with children in violation of the December 4th supervision order; and (d) that there was a warrant for her arrest for felony child abuse charges involving one of the children as the victim.

155. The Kentwood Police Department made a request of the Mecosta County Sheriff's Department to assist with the parenting exchange.

156. Plaintiff met the deputies in Mecosta County and the deputies transferred the children to his care.

157. The deputies then lawfully arrested the mother pursuant to the valid, court issued warrant for her arrest in the Kent County criminal child abuse case.

158. But, Defendants Kuchan and Bolden blamed Plaintiff for the mother's arrest.

159. Defendants Kuchan and Bolden falsely reported that Plaintiff had intentionally set the mother up for arrest, had the mother arrested in view of the children, and that viewing the arrest emotionally harmed the children.

160. Defendants Kuchan and Bolden's report is completely contrary to the arresting deputy's report.

161.     The arresting deputy, Deputy Haynes, reported that he and another deputy first made contact with the maternal-grandmother at her home.  She invited them in to see the mother.   The Deputies informed the mother they were there to assist with the parenting exchange.  The mother claimed that Plaintiff did not have parenting rights and that she had court documents in her car that she could retrieve, "*which allowed her to exit the residence at which time we informed her of the warrant*." They then followed the mother into the residence so she could arrange for the children to go out to Plaintiff.  "*We observed the transfer of custody of the two children to [Plaintiff], [Plaintiff] then left the residence without incident*." After Plaintiff left the residence with the children, the Deputies then arrested the mother on the outstanding warrant out of the view of the children.

162.     Defendants Kuchan and Bolden never spoke with the deputies.

163.     The children did not witness the arrest.

164.     The children were made aware of the arrest by the mother and MDHHS.

165.     Ironically, it was the mother who was under court order in the Custody Case to not call law enforcement regarding Plaintiff or the children unless there was an actual, physical emergency.

166.     The court in the Custody Case had admonished the mother for calling law enforcement 15 to 20 times for non-emergency matters, and had issued an order of show cause for mother's violation of her order.

167.     The court had issued such order because it was specifically concerned about the impact those interactions with law enforcement were having on the children.

168.     Defendants Kuchan and Bolden incorporated false statements from the mother that she was the victim of domestic assault during the marriage in 2009 without investigating such claims.

169.     Plaintiff and the mother lived in Wixom in 2009.

170.     Wixom police had received 18 complaints from the mother during that time.

171.     None of those complaints related to domestic violence, substance abuse or assault; instead those were complaints related to personal property disputes in the divorce.

172.     Defendants Kuchan and Bolden were aware of the mother's pattern of stating falsehoods, staging scenes and making false reports.

173.     For example, after the 2010 divorce the Plaintiff and mother reconciled from the Fall of 2011 until Spring of 2013.  The mother denied this fact in her interrogatories, depositions, and trial testimony in the Custody Case.

174.     Nevertheless, the court found, based upon a lengthy text message and email record between the parties, and 3-days of trial testimony that, in fact, Plaintiff and mother had reconciled for a considerable period of time contrary to mother's assertion.

175.     The mother had, during that period of reconciliation, and unknown to Plaintiff, maintained a relationship with another man who, ultimately, fathered a child with her.

176.     Another example involves mother's false affidavit on October 3, 2013 in order to obtain a Personal Protection Order against Plaintiff.

177.     The court heard 3-days of testimony and reviewed surveillance video.  The court found that the mother's description of events varied from the surveillance video.  The court also found that the mother had been sending numerous, intimate text messages to Plaintiff – again, contrary to her sworn testimony.  The court rescinded the mother's Personal Protection Order against Plaintiff.

178.     Another example includes the mother staging a false report against Plaintiff of felonious assault on February 4, 2014.

179.     The mother falsely reported to the Kentwood Police Department that Plaintiff had tried running her over with his vehicle.

180.     Video footage and witness accounts showed that the mother stood in front of Plaintiff's vehicle blocking his exit from a parking lot while on the phone with 9-1-1.

181.     The children were present and she involved the children who were seen begging her to get out of the way.

182.     Criminal charges against Plaintiff were denied by the prosecutor, and the mother was admonished for her behavior by the court.

183.     These examples, and others, were supported by documents, video, audio, police reports, and court documents all provided to Defendants Kuchan and Bolden by Plaintiff.

184.     But Defendant Kuchan had made up his mind regarding the mother in his first interview with her on November 30th without even doing the bare minimum of his investigation responsibilities.

185.　　　On or about March 2, 2016, Defendants Kuchan and Bolden closed the physical abuse investigation of the mother as unsubstantiated -- citing no preponderance of the evidence for physical abuse.

186.　　　Their decision was made even while the criminal case was still pending.

187.　　　Their decision was made having never spoken with Dr. VandenBosch.

188.　　　Their decision was inconsistent with the photographs of the boy's injuries.

189.　　　Their decision was inconsistent with the boy's statements to Dr. VandenBosch.

190.　　　Their decision was inconsistent with the children's statements to the initial KCPS investigator, Kaley Dzwonkowski.

191.　　　Their decision was inconsistent with the boy's statements to Officer Schaaf.

192.　　　Their decision was inconsistent with the children's original statements to Defendant Kuchan and the detective -- prior to being returned to their mother's care.

193.　　　Their decision was inconsistent with past complaints of domestic violence between the mother and maternal-grandfather.

194.　　　Their decision was inconsistent with the reports of the mother's unpredictable, emotionally volatile, impulsive and aggressive behaviors.

195.　　　Their decision was inconsistent with the mother's violations of the orders in the Custody Case relating to their investigation.

196.　　　Defendant Kuchan refused to review the information provided to him by Plaintiff.

197.     Defendant Bolden signed off on Defendant Kuchan's investigation without reviewing the investigation report, following up regarding collateral contacts, or reviewing the information provided to MDHHS by Plaintiff.

198.     Instead, Defendants Kuchan and Bolden falsely accused Plaintiff of fabricating complaints against the mother to damage her character.

## II.     *Plaintiff's first expunged substantiation*

199.     Each and every allegation of the Complaint is incorporated as if fully set forth herein.

200.     During the investigation of the mother, Defendants Kuchan and Bolden applied a double standard to their interactions with Plaintiff.

201.     Plaintiff would later be told by Defendant Cindy Shackleton that this was because he was the father, not the mother of the children.

202.     Defendants Kuchan and Bolden requested that Plaintiff submit to a psychological examination.

203.     Defendants Kuchan and Bolden were already aware that Plaintiff, and the mother, during their divorce, had seen Dr. Priya Rao of the Northbrook Psychological Clinic.

204.     Dr. Rao had served as a certified forensic psychologist for the State of Michigan Center for Forensic Psychiatry; as a Court Clinical Psychologist for the Third Circuit Court Clinic for Child Study; and interned in the Department of Psychiatry and Psychology at the Children's Hospital in Detroit, Michigan.

205.     Dr. Rao first worked with the family in 2009 prior to the divorce.

206.     Dr. Rao had offered opinions in the Custody Case that she had no concerns regarding Plaintiff's ability to parent but strong concerns regarding the mother.

207.     In part, Dr. Rao's concern was based upon a closed-head injury that the mother sustained in a car accident that resulted in unpredictable, emotionally volatile, impulsive and aggressive behaviors.

208.     Plaintiff provided this information to MDHHS.

209.     Defendants Kuchan and Bolden ignored it.

210.     Despite this, Plaintiff voluntarily completed the MDHHS requested psychological evaluation on January 6, 2016.

211.     Plaintiff was under no obligation to submit to Defendants Kuchan's and Bolden's request.

212.     The result of the psychological examination raised no concerns regarding his capacity to parent and reported normal mental health.

213.     Defendants Kuchan and Bolden then requested that the children receive psychological examinations.

214.     As joint custodian, Plaintiff was under no obligation to allow his children to be examined.

215.     In fact, the children previously had assessments and were being treated for same.

216.     Plaintiff voluntarily agreed to the new assessments and cooperated with his children being examined.

217.     Dr. William McInnis, a licensed Michigan psychologist, conducted the psychological examinations of both children.

218.     When MDHHS refers a child or parent to a third party provider, or is involved in communications with a third party provider, the MDHHS employee will ordinarily send an investigation report, updated services plan, or other summary of the case to the third party provider for context.

219.     Such reports contain the information as collected, processed and summarized by the MDHHS employee.

220.     Thus any error or bias contained in such report is passed along to the third party provider.

221.     Dr. McInnis provided his written psychological evaluations of the children in March 2016.

222.     At no point in his reports of the children did Dr. McInnis state that a pattern of physical or verbal acts or omissions on the part of Plaintiff caused the psychological or emotional injury/impairment to either child.

223.     Nor did he report that Plaintiff posed a significant risk to the children of being psychologically or emotionally injured/impaired.

224.     Dr. McInnis then testified in the Custody Case to his evaluations, reports and diagnoses.

225.     Again, Dr. McInnis made no connection between the children's diagnoses and acts or omissions by Plaintiff.

226.     Nor did he testify that Plaintiff placed either child at a significant risk of being psychologically or emotionally injured/impaired.

227.     To the extent that Dr. McInnis provided insights into the impact upon the children by their parents' custody fight, he testified to it being an issue for both parents

and recommended that both parents have some parental mediation sessions "*because [he really felt] like if the parents are able to work through their differences that that's going to help the kids greatly reduce their [stress]*."

228.     Other factors impacting the children's behaviors and diagnoses were stress associated with school, peer stressors, their sibling dynamics, the dynamics of a younger half-sibling and the father of that child, and the double-homicide that occurred in their mother's neighborhood.

229.     All of these factors were known to Defendants Kuchan and Bolden.

230.     Defendants Kuchan and Bolden referred the children to therapy with Liz Hayes of Defendant YWCA.

231.     The therapy with Ms. Hayes occurred with the children in their mother's home, with the mother present in the home during the therapy.

232.     Ms. Hayes did not report that the children's issues were related to a pattern of physical or verbal acts or omissions on the part of Plaintiff beyond the stress of the Custody Case by both parents.

233.     In fact, Ms. Hayes's testimony was that the majority of the issues for the children were equated to school stresses, peer stresses, and their sibling dynamics.

234.     Ms. Hayes testified that she had no safety concerns related to Plaintiff's parenting of the children and, if she did, she would be required to report as a mandatory reporter.

235.     On or about April 22, 2016, Defendants Kuchan and Bolden substantiated Plaintiff for mental injury and threatened harm to both children.

236.     The substantiation was made without satisfying the unambiguous statutory and MDHHS policy bases for such substantiation.

237.     The statutory and policy bases include the statutory definition of "child abuse" MCL 722.622(g); the policies contained in MDHHS PSM 711-5; and MDHHS PSM 711-4.

238.     It also includes the Note to MDHSS PSM 711-5 which makes clear that "to make a finding of mental injury, a mental health practitioner must assess the child and either diagnose a psychological condition or determine that the child is at significant risk of being psychologically or emotionally injured/impaired."

239.     Defendant Nicole Luster later testified in the Custody Case that *"mental injury is extremely difficult to substantiate"..."because it's not a matter of preponderance of the evidence, but basically an expert, what an expert is stating, and I haven't had any – I don't recall any experts just stating or demonstrating that it was a mental injury like this."*

240.     She also testified that when the case was transferred to her after substantiation, there was nothing she could do as the ongoing worker to change the substantiation.

241.     Defendants Kuchan and Bolden ignored well established law and policy in substantiating Plaintiff.

242.     Defendants Kuchan and Bolden ignored or mischaracterized the observations of the mental health professionals in reaching their decision to substantiate Plaintiff.

243.     Defendant Kuchan and Bolden were not mental health practitioners under Michigan law or MDHHS policy.

244.     Defendants Kuchan and Bolden held against Plaintiff the mother's arrest in Mecosta County, despite the fact that it was the Sheriff's Department who arrested her pursuant to a valid warrant issued by the court; and despite the fact it was the mother and MDHHS who informed the children of the her arrest.

245.     Defendants Kuchan and Bolden falsely accused Plaintiff of misrepresenting the advice of MDHHS and the guardian ad litem when he attended the mother's criminal arraignment.

246.     Defendant Kuchan claimed that no one was asking for supervision, a no contact order, or the children to be out of the mother's care.

247.     But Ms. Dzwonkowski specifically emailed Plaintiff that:

> *I emailed [the guardian ad litem] and let her know that I was the on-call worker and that the case is being assigned to an investigator. I informed her that it would be in the best interest of the children to remain in the [Plaintiff's] custody until the investigation can be complete including notifying Kentwood Police Department and requesting a joint investigation.*

248.     And, the guardian ad litem messaged Plaintiff and the mother that:

> *I have reviewed the initial police report and urgent care record concerning the alleged physical abuse of [the boy]. I have also been in communication with CPS concerning their ongoing investigation into the same and I would currently recommend and support a temporary order from Judge Feeney for extended parenting time with the children for [Plaintiff]. Once this matter is sorted out and investigated and follow up medical results are forthcoming, we can then move forward. I would further recommend that during this extended period of parenting time that [the mother] have supervised parenting time at Journeys or Safe Connection at the YWCA. This is for the protection of the children as well as the parties. I expect this recommendation to be submitted with the request and Petition to Judge Feeney for her review.*

249.     That is precisely what Plaintiff told the arraigning judge.

250.     Defendants Kuchan and Bolden also claimed that a basis for the substantiation was that Plaintiff had refused services.

251.     Defendant Kuchan's own email exchange with Plaintiff was exactly opposite:

Plaintiff's email to Defendant Kuchan:

> *Kaley & Dan,*
> *Afternoon, I was informed today that CPS has offered services for this situation and there was a claim that I denied the services offer of CPS to me. I am not aware of any offer during initial interview with Kaley or during the phone conversation with [Defendant Kuchan] that got cut off early by cellular signal and unable to reach by phone after the return call. Can you please assist me on the clarity of services that are offered and if either of you had shared with me?*

Defendant Kuchan's reply:

> *I have not provided you with information about services. You have not declined to participate in services during this investigation. I will be sending an email shortly with information attached.*

252.     Nevertheless, Plaintiff was placed on Michigan's statewide Child Abuse and Neglect Central Registry by Defendants Kuchan and Bolden.

253.     Defendant Jeremy Novosad then took over the review of the investigation and supervision of Defendant Kuchan from Defendant Bolden.

254.     Plaintiff made Defendant Novosad aware of all the foregoing facts.

255.     Defendant Novosad failed to act or correct the investigation.

256.     The case was then transferred to KCPS caseworker Defendant Nicole Luster for ongoing services.

257.     The case was discussed internally among Defendants Kuchan, Bolden, Novosad, Shackleton and Luster.

258.     Defendant Luster never investigated any of the claims underlying the substantiation.

259.     Defendant Shackleton never investigated any of the claims underlying the substantiation.

260.     After approximately two-months, Defendant Luster closed the case related to Plaintiff's substantiation.

261.     Despite closing the case, Defendant Luster renewed the referral for the children's counseling with Liz Hayes at the YWCA due to the Custody Case.

262.     Defendant Luster also referred the mother to Legal Aid of Western Michigan to provide free legal services in her battle against Plaintiff in the Custody Case; despite the fact that the mother previously retained private counsel to assist her.

263.     In fact, in September 2016, Defendant Luster sat in the courtroom with the mother for 3-hours during a Custody Case proceeding as the mother's support person.

264.     MDHHS is a policy driven environment.

265.     Defendant Luster testified to same.

266.     MDHHS produces handbooks that each employee receives containing MDHHS policies.

267.     Defendant Luster testified to same.

268.     MDHHS provides memoranda, from time to time, for any policy changes or to clarify any policy for which it believes there could reasonably be ambiguity.

269.     Kent County – MDHHS employees receive training from MDHHS at the time of hire.

270.     Kent County – MDHHS employees receive in excess of 32-hours of MDHHS annual training.

271.     Kent County – MDHHS employees receive a 2-hour MDHHS training session each Thursday afternoon.

272.     Defendant Luster testified that she received all such training.

273.     There is a handbook for the forensic interview protocol of a child that is provided by MDHHS to MDHHS employees.

274.     Defendant Luster testified to same and testified that she follows it.

275.     The handbook specifically states that interviews (in order of possibility) should be video recorded, then audio recorded, and then written notes taken of each question asked and response given.

276.     But Defendant Luster testified that she does not do those things.

277.     Defendants Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, and Selden-Johnson have or had a practice or pattern of instructing their employees not to follow the forensic interview protocol.

278.     They instruct or instructed not to video record interviews, even if possible.

279.     They instruct or instructed not to audio record interviews, even if possible.

280.     They instruct or instructed to destroy their contemporaneous written notes of interviews.

281.     They instruct or instructed not to write down each question asked, and each answer given.

282.     Plaintiff requested an administrative law proceeding to challenge the substantiation of mental injury and threatened harm, and to expunge the matter.

283.     MDHHS policy requires that a parent receive an administrative hearing within a reasonable period following an expunction denial by MDHHS.

284.     Defendants Novosad, Kuzma and Orr stonewalled Plaintiff's request.

285.     Defendants Novosad, Kuzma and Orr knew they had previously approved Defendant Kuchan's report.

286.     Defendant Kuchan testified to same in the Custody Case.

287.     Plaintiff finally received correspondence regarding his request for a formal hearing in March 2017.

288.     Plaintiff did not, and could not, have known the extent of Defendants' conduct until March 2017 or after.

289.     Defendant Kuchan did not testify in the Custody Case until March 2017.

290.     Dr. McInnis did not testify in the Custody Case until March 2017.

291.     Liz Hayes did not testify in the Custody Case until June 2017.

292.     Defendant Luster did not testify in the Custody Case until July 2017.

293.     Plaintiff contacted the Michigan Office of Children's Ombudsman ("Ombudsman").

294.     The Ombudsman independently investigates complaints about children involved with MDHHS.

295.     The Ombudsman informed Plaintiff that the MDHHS investigation did not support a substantiation for mental injury and threatened harm.

296.     The Michigan Attorney General's office became involved, reviewed the case materials, and advised MDHHS to stipulate to the expunction.

297.     MDHHS reversed the substantiation and granted the expunction; but only after the involvement of the Attorney General's office.

### III. Plaintiff's second expunged substantiation.

298.     Each and every allegation of the Complaint is incorporated as if fully set forth herein.

299.     On or about April 12, 2017, Plaintiff filed a motion in the Custody Case and served it upon the mother on April 13, 2017.

300.     The very next day KCPS received a complaint from the mother alleging Plaintiff had abused his son.

301.     The false allegations reported by the mother to KCPS were that Plaintiff and his son got in an argument about incomplete homework and, during the argument, that Plaintiff squeezed his son's left arm leaving two dime-sized bruises on his bicep.

302.     The case was again assigned to Defendant Luster.

303.     Defendant Luster and her supervisors Defendants Kuzma and Shackleton immediately substantiated Plaintiff for physical abuse.

304.     Plaintiff's son (at that point almost 14 years old) told Defendant Luster that the injury came when he and his friend were playing in the woods during high floodwater and caught a Canadian goose.

305.     Plaintiff and his son provided to Defendant Luster the names of that friend and the friend's father as collateral contacts.

306.     Defendant Luster was also given a photograph of Plaintiff's son holding the Canadian goose with the arm that was bruised that day.

307.     MDHHS policy requires interviewing collateral contacts as part of an investigation.

308.     The collateral contacts provided by Plaintiff and his son were not interviewed by Defendants Luster, Kuzma or Shackleton.

309.     The collateral contacts provided by Plaintiff and his son have never been interviewed by MDHHS.

310.     Polygraphs are given weight by MDHHS investigators during an investigation of alleged abuse.

311.     Defendants Luster, Kuzma and Shackleton were given the results of the polygraph test taken by Plaintiff.

312.     The polygraph stated the following:

*EXAM QUESTIONS:*
*A total of three tests were administered containing the following relevant questions:*
*Question #1:   Did you cause that bruise on Tyler's left arm?*
*     Answer: No*
*Question #2:   Did you do anything to Tyler that would have caused that bruise on his left arm?*
*          Answer: No*
*Question #3:   In Late March or early April of this year did you cause that bruise on Tyler's left arm?*
*          Answer: No*

*CHART ANALYSIS FINDING:*
*No Deception Indicated*

*OPINION:*
*Several polygrams were completed using the previously listed questions. Following a thorough analysis of the polygrams, and the use of standardized numerical evaluation techniques these polygrams scored conclusively into the range consistent with a TRUTHFUL examinee.*

313.     Defendants Luster, Kuzma and Shackleton never went to Plaintiff's house to investigate the home environment.

314.     Defendant Luster visited in the mother's home more than five times in the same time period.

315.     Defendant Luster testified to same in the Custody Case.

316.     Defendants Luster, Kuzma and Shackleton placed Plaintiff on Central Registry for a second time.

317.     A child welfare petition was then authored by Defendant Luster and approved by Defendants Kuzma and Shackleton.

318.      Defendants Luster, Kuzma and Shackleton did not conduct an investigation prior to submitting the petition to the court or substantiating Plaintiff.

319.     She testified to same in the Custody Case.

320.     Defendant Luster also testified that "*Wendy instructed me to start the neglect petition.*"

321.     "Wendy" is the children's mother who made the allegation of abuse the day after Plaintiff filed a custody motion in the Custody Case; she is not an employee of MDHHS.

322.     Under federal and state law, and MDHHS policy, parents of children under investigation do not control whether or not a petition is drafted and filed with the court.

323.     Defendants Luster, Kuzma and Shackleton then presented the petition to the 17th Circuit Court referee "on inquiry".

324.     "On inquiry" petitions permit MDHHS, under certain circumstances, to request that the court circumvent a parent's ordinary due process rights of a probable

cause hearing and preliminary examination hearing at the commencement of a child welfare action.

325.     The court relies upon the accuracy of the information provided by MDHHS when making a decision to consider a petition on inquiry.

326.     Plaintiff was a custodial parent for purposes of a petition.

327.     Defendants Luster, Kuzma and Shackleton knew that fact at the time they filed the petition "on inquiry."

328.     There was no basis for an "on inquiry" request of the court by Defendants Luster, Kuzma and Shackleton.

329.     Predictably, the result was the removal of the children from Plaintiff's care on or about May 5, 2017 without a "hearing on his fitness as a parent before his children were taken from him".[2]

330.     The Kent County Prosecutor criminally charged Plaintiff with misdemeanor child abuse based solely on the report of MDHHS.

331.     The police complaint was referred to the Prosecutor by Deputy Tyson Moore of the Kent County Sheriff's Department.

332.     The complaint was made to law enforcement by MDHHS.

333.     Law enforcement never interviewed the children or investigated prior to referring their "investigation" for charges.

334.     Deputy Moore simply attached the KCPS Investigative Report to his incident report and submitted it to the prosecutor.

335.     The criminal case was quickly dismissed.

---

[2] *Stanley v Illinois*, 405 U.S. 645, 649 (1972).

336.     The legal standard in Michigan for the prosecutor to charge the crime was merely probable cause.

337.     That case was dismissed.

338.     The legal standard in Michigan for the 17th Circuit Court referee to authorize Defendants' petition against Plaintiff was merely probable cause.

339.     That case was brought "on inquiry" and, ultimately, dismissed.

340.     The legal standard in Michigan for Defendants Luster, Kuzma and Shackleton to substantiate Plaintiff was, instead, preponderance of the evidence.

341.     In Michigan, preponderance of the evidence is a higher factual and legal burden than probable cause.

342.     The investigation and substantiation did not meet that burden.

343.     Defendant Luster's excuse was that she only filed the petition because Plaintiff "*would not participate with services*" that Defendants Luster, Shackleton and Kuzma wanted Plaintiff to submit to.

344.     She testified to same in the Custody Case.

345.     A parent is only required to "participate with services" after a court of competent jurisdiction has adjudicated a petition and ordered such services at the initial disposition hearing.

346.     Michigan law and MDHHS policy is clear that participating with services is not mandatory for a parent at the MDHHS investigation stage.

347.     Michigan law and MDHHS policy is clear that participating with services is not mandatory for a parent at the MDHHS substantiation stage.

348.     Michigan law and MDHHS policy is clear that participating with services is not even mandatory for a parent after a court has authorized an MDHHS petition alleging child abuse.

349.     Michigan law and MDHHS policy is clear on when removal of a child from a parent's care is needed and should be requested by MDHHS.

350.     Michigan law and MDHHS policy is clear on when supervised parenting time is needed and should be requested by MDHHS.

351.     Michigan law and MDHHS policy is clear that removing a child from a parent's care is not to be used as a stick to coerce parents into participating with services.

352.     Michigan law and MDHHS policy is clear that requesting supervised parenting time is not to be used as a stick to coerce parents into participating with services.

353.     Nevertheless, Defendants Luster, Shackleton and Kuzma, requested that the Plaintiff's parenting time with his children be supervised.

354.     Defendant Luster testified in the Custody Case that she prepared a case services agreement in which she requested that Plaintiff participate in a Nurturing Fathers/Nurturing Parents program with therapist, Kyle Hinton, and in an anger management program with Kyle Hinton.  Defendant Luster later requested that Plaintiff take Arbor Circle Intensive Parenting, another program provided directly by Kyle Hinton.

355.     Therapist Kyle Hinton provided numerous letters and reports to MDHHS indicating that Plaintiff was complying with the services, but that Plaintiff did not need these services.

356.     In fact, Kyle Hinton offered numerous concerns related to the mother's parenting - not Plaintiff's parenting.

357.     During the 5-months that the children were exclusively in the mother's care, three additional reports of child abuse caused by the mother were reported to Defendant Luster by the children.

358.     One report was that the mother whipped the boy with a pair of denim overalls using the brass buttons on the straps.

359.     The second report was that the mother pulled the girl's hair excessively for failing to properly load the dishwasher.

360.     The third report was that the mother dug her nails into the flesh of the boy's arm leaving an injury.

361.     Each of these reports came while the children were exclusively in the mother's care.

362.     But once again MDHHS failed to substantiate the mother of any abuse.

363.     In addition, the behaviors of the children escalated while exclusively in the mother's care.

364.     The girl, then only 10-years old, threatened to shoot-up her school.

365.     The boy had increased behavioral problems at school, declining grades and attendance, and attempted on more than one occasion to run away from his mother's care.

366.     Defendant Luster testified to the same in the Custody Case.

367.     YWCA therapist Liz Hayes also testified to the same in the Custody Case.

368.     In fact, Ms. Hayes further testified as follows:

| | |
|---|---|
| *Question from Counsel:.* | *All right. So it's been a little more than six or seven weeks that the kids have been in [their mother's] virtually exclusive care?* |
| *Answer from Ms. Hayes:* | *Correct.* |
| *Q.* | *And things have gotten worse for [the boy] rather than better?* |
| *A.* | *Correct.* |
| *Q.* | *And you attribute that to [Plaintiff's] parenting style?* |
| *A.* | *I attribute that to the presence of [Child Protective Services].* |
| *Q.* | *So, if [Child Protective Services] was out, the kids would be doing better?* |
| *A.* | *In some ways, I would think.* |

369.    Five months later, MDHHS's case against Plaintiff was withdrawn by the assistant Kent County Prosecutor despite the objection of MDHHS.

370.    Once again, Plaintiff requested an administrative law proceeding to challenge this second substantiation by MDHHS and expunge the matter.

371.    Once again, the expunction was granted by MDHHS after review by the Attorney General's Office, and the substantiation was reversed.

372.    As part of the dismissal of the court case, a safety plan was stipulated to by the mother and Plaintiff.

373.    The safety plan required the mother and Plaintiff "*to participate and/or make the children available to participate in services referred by the Department of Health and Human Services that are intended to address the needs identified in the Children's Trauma Assessment from CTAC or identified by Kyle Hinton in the family therapy at New Visions Counseling.*"

374.    Plaintiff fully complied with the terms of the safety plan.

375.    The mother failed each and every component of the safety plan.

376.     Such information was reported to MDHHS.

377.     Once again, MDHHS took no action and made no substantiation against the mother.


## IV.     *Supervision of Plaintiff's Parenting Time*

378.     Each and every allegation of the Complaint is incorporated as if fully set forth herein.

379.     During that second case, Defendants Luster, Shackleton and Kuzma selected Defendant YWCA to provide supervision of Plaintiff's parenting time through its Safe Connections program.

380.     The Safe Connections program was administered by Defendant Ruthie Paulson.

381.     MCL 712A.13a(13) provides "if a child is removed from the parent's custody at any time, the court must permit the child's parent to have regular and frequent parenting time with his or her child of "not less than 1 time every 7 days unless the court determines either that exigent circumstances require less frequent parenting time or that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being. If the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists."

382.     According the MDHHS Policy, "Parenting time and/or visitation is an interactive face-to-face contact between a child and his or her parents, siblings or other family members. It is separate from counseling, therapy, assessments, case reviews,

family team meetings, or court hearings. Parenting time/visitation can be supplemented with other types and means of contact such as phone calls, letters email, pictures, tapes, and gifts. This contact should be allowed and encouraged unless the child's or others' safety or well-being may be compromised."

383. In addition, MDHHS policy dictates that parenting time be unsupervised unless supervision is necessary to protect the children.

384. MDHHS policy dictates that MDHHS move as quickly as possible to expand parenting time and eliminate supervision.

385. Defendants Luster, Shackleton and Kuzma knew that Plaintiff posed no threat to the children that required supervision of parenting time.

386. Defendants Luster, Shackleton and Kuzma already had the psychological evaluation and capacity to parent report from the 2016 case indicating no concerns regarding Plaintiff.

387. Defendants Luster, Shackleton and Kuzma were already aware that Plaintiff was voluntarily taking a parenting class through Wedgewood Christian Services, an MDHHS contract agency, in follow-up to the suggestions made for both parents by Dr. McInnis in the 2016 case.

388. In fact, Wedgwood provided a report stating that:

> *[Plaintiff] has been a faithful attender of the class. He arrives on time and comes prepared for class as evidenced by arriving with his call materials in hand and knowledge of the materials to signify that he has read the materials as assigned each week. [Plaintiff] is open and engaged in the class discussions. He asks questions and makes relevant comments to the group. He is kind to the therapist who facilitates the group and the group members. He provides verbal encouragement and validation to the other members of the group during the class discussions. [Plaintiff] is an asset to the group for his contributions to the class discussions and activities and a joy to have in the class!*

389.     Defendants Luster, Shackleton and Kuzma were already aware that Plaintiff was voluntarily attending counseling with Dr. Priya Rao of the Northbrook Psychological Clinic.

390.     Defendants Luster, Shackleton and Kuzma were aware that Dr. Rao had offered an opinion in the Custody Case that Plaintiff posed no threat to the children.

391.     Defendants Luster, Shackleton and Kuzma were already aware that Dr. Rao, like Kyle Hinton, had expressed greater concerns regarding the mother.

392.     Defendants Luster, Shackleton and Kuzma were also aware that neither Dr. McInnis nor Liz Hayes – at any point during the 2016 case – advised that the children should be removed from Plaintiff's care or that his contact with the children should be supervised.

393.     Defendants Luster, Shackleton and Kuzma were aware that it was the mother's parenting time that was recommended to be supervised by both Ms. Dzwonkowski and the guardian ad litem in the 2016 case, and that the court had ordered that the mother have third party supervision during that investigation.

394.     In the 5-months from May 5, 2017 until October 12, 2017, Defendants only allowed Plaintiff to see his children for 2-hours each week with supervision.

395.     Defendants YWCA and Paulson did not provide, or make-up, all of that meager parenting time.

396.     Defendants Luster, Shackleton and Kuzma did not provide, or make-up, all of Plaintiff's parenting time.

397.     Defendant Paulson placed the parenting time blame upon MDHHS.

398.     Defendant Paulson emailed Plaintiff that Defendant Luster instructed her there could be no make-up time in Plaintiff's case.

399.     Defendants Luster, Shackleton and Kuzma placed the parenting time blame upon Defendants YWCA and Paulson.

400.     After Defendant Paulson cancelled parenting time between Plaintiff and his daughter, Defendant Luster testified in the Custody Case that:

| | |
|---|---|
| *Answer from Ms. Luster:* | *...And I – I really believe that Mr. Tingley should've been made aware of what was going on versus a decision being made without him, you know, making that or contributing to –* |
| *Question from Counsel:* | *(Overlapping) So your concern is –* |
| *A:* | *-- the decision.* |
| *Q:* | *So your concern is the Safe Connections supervisor is kind of unilaterally making a decision for [daughter] not to participate in supervised parenting time without even getting Mr. Tingley's input?* |
| *A:* | *Correct.* |

401.     Throughout the parenting time period there was blame being exchanged between Defendant Paulson and Defendant Luster.

402.     MDHHS policy requires that parenting time rules be provided to parents so that parents have a clear understanding of what the expectations are during supervised parenting time.

403.     At all times relevant to this lawsuit, the YWCA ordinarily provided parents a document titled Safe Connections Supervised Parenting Time and Safe Exchange Program, Parent Handbook, Rules and Guidelines ("Safe Connections Handbook").

404.    Plaintiff complied with those rules throughout his parenting time at Safe Connections.

405.    But, Defendant Luster provided Defendant Paulson an everchanging list of additional rules for Plaintiff.

406.    Defendant Luster never provided Plaintiff with those, or any other rules, related to parenting time.

407.    She testified as such in the Custody Case.

408.    In fact, Defendant Luster placed the blame upon Defendants YWCA and Paulson for not getting Plaintiff the rules.

409.    Defendant Luster testified that the "other rules" came from Safe Connections.

410.    Defendant Luster testified that she had a conversation about the "other rules" with Defendant Paulson.

411.    Defendant Luster testified that based on that conversation she believed Defendant Paulson would communicate the "other rules" to Plaintiff.

412.    Defendant Luster refused to provide Plaintiff a copy of the rules when asked by Plaintiff through counsel.

413.    Defendants YWCA and Paulson did not offer to provide the additional rules to Plaintiff until 4-months after his parenting time had started and he was already being accused of violating the rules.

414.    Defendants Luster, Kuzma and Shackleton held against Plaintiff alleged violations of the rules and refused to remove supervision of his parenting time.

415.     Contrary to what Defendants Luster and Paulson stated, the parenting time reports were overwhelming positive regarding Plaintiff.

416.     Noted concerns in the reports primarily related to behaviors and disclosures by the children related to their mother's continued abuse.

417.     Defendant Luster mischaracterized the nature and extent of those parenting time reports.

418.     Defendant Paulson mischaracterized the nature and extent of those parenting time reports.

419.     In addition, Defendant Luster denied Plaintiff timely access to those parenting time reports.

420.     Initially, Defendant Paulson agreed to provide Plaintiff with the parenting time reports.

421.     In fact, the Safe Connections Handbook states that parents will receive such parenting time reports with 14-days notice.

422.     Then, Defendant Paulson refused and demanded a subpoena in order to provide such reports.

423.     She stated that Defendant Luster was demanding that Plaintiff wait for all future parenting time reports to come from Defendant Luster.

424.     Judge Feeney admonished Defendant Luster for not providing the parenting reports to Plaintiff in a hearing held August 25, 2017 in the child welfare case.

425.     Judge Feeney also admonished Defendant Luster for failing to follow through satisfactorily on the court's request from June 30, 2017 that MDHHS approve additional supervisors identified by Plaintiff in order to expand Plaintiff's parenting time.

426. Judge Feeney admonished Defendant Luster for not having expanded Plaintiff's parenting time at all from the June 30 hearing to the August 25 hearing.

## V. *Plaintiff's third expunged substantiation.*

427. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

428. On or about June 20, 2019 KCPS received another false referral by the mother alleging improper supervision of the children by Plaintiff.

429. Such referral came just after additional court involvement with the mother.

430. Plaintiff's son has exclusively been in Plaintiff's care since August of 2018 due to an incident between the mother and the boy.

431. In fact, the court had to enter an order restricting the mother's contact with the boy to no closer than ten feet unless requested by the boy.

432. Defendant Shelbie Williams was assigned the 2019 complaint made by the mother.

433. The allegation was that Plaintiff's son, then 16 years old, was driving a vehicle with Plaintiff as part of his driver's education; that the boy improperly navigated a round-about; that Plaintiff instructed the boy to pullover and Plaintiff switched places driving; but that Plaintiff was unlawfully intoxicated at that time.

434. There was no evidence of intoxication.

435. There was no evidence of alcohol consumption within a relevant time period.

436. There was no traffic stop or police contact.

437.     The only evidence was that Plaintiff had consumed one beer with pizza, hours earlier, while with the children at a family friend's house.

438.     When Defendant Williams interviewed Plaintiff, he requested that his attorney be available via speakerphone.

439.     Defendant Williams attempted to prevent Plaintiff from having assistance of counsel, but Plaintiff insisted on having his attorney available.

440.     Defendant Williams requested that Plaintiff submit to a drug screen.

441.     There were no allegations of drug use related to the June 20 incident.

442.     There were no allegations of substance abuse by Plaintiff in any of the prior MDHHS investigations.

443.     Plaintiff refused the drug screen on advice of counsel.

444.     Defendant Williams attempted to coerce Plaintiff into taking the drug screen.

445.     Defendant Williams told Plaintiff that if he refused the drug screen she would substantiate him and have his children removed from his care

446.     MDHHS policy does not require a drug screen when there is no allegation of drug use.

447.     Michigan law and MDHHS policy is clear that MDHHS drug screening is voluntary unless court ordered.

448.     Michigan law and MDHHS policy is clear that a parent cannot be substantiated for child abuse or neglect for refusing to submit to a voluntary drug screen.

449.     Plaintiff provided two collateral contacts to Defendant Williams.

450.     Only one collateral contact was ever interviewed.

451.     That collateral contact confirmed that Plaintiff consumed one beer with pizza and there were no concerns when Plaintiff and the children left his home.

452.     The mother sent Defendant Williams an obsolete order from the 2009 Oakland County divorce case claiming that Plaintiff was not to consume alcohol within 8-hours of his parenting time.

453.     Defendant Williams did not ask Plaintiff about the order.

454.     Plaintiff could have informed Defendant Williams that the order was obsolete.

455.     Defendant Williams did not contact the court regarding the Custody Case to confirm the enforceability of the order.

456.     Defendant Williams did not contact Friend of the Court to confirm the enforceability of the order; though she contacted Friend of the Court for other reasons.

457.     When Defendant Williams interviewed Plaintiff's son, the boy confirmed that the investigation was "*because of his mom saying things that aren't true*."

458.     The mother admitted to Defendant Williams that there is an order in the Custody Case prohibiting her from contacting law enforcement regarding Plaintiff and the children due to her history of numerous and/or false reports made against Plaintiff.

459.     Nevertheless, Defendant Williams stated that:

> *There is a preponderance of the evidence to support the allegations of improper supervision due to child disclosures, violation of a court order and extensive ongoing history of [Plaintiff] using and abusing substances. There is concern that there is a statement in the court order regarding stipulations surrounding [Plaintiff's] substance use, and that he continues to use substances. Additionally, there is concern due to [Plaintiff's] refusal of a drug screen and significant inconsistencies in what was reported between the family members that were interviewed.  This case will be a category II with high risk.*

460. There was no violation of a court order.

461. There was no "extensive ongoing history of [Plaintiff] using and abusing substances".

462. Plaintiff was not required to submit to a drug screen under MDHHS policy and there were no allegations related to drug use in the June 20 incident.

463. There were no inconsistencies in the reports provided by Plaintiff, Plaintiff's son, or the one collateral contact interviewed by Defendant Williams.

464. In addition, Defendant Williams cited that Plaintiff has "*a substantiated history of mental injury, threatened harm and physical abuse*" – which are substantiations that were reversed and expunged in the first and second cases involving Plaintiff.

465. Nevertheless, Defendant Williams and her supervisor Defendant Keri Desmarais reviewed the investigation and substantiated Plaintiff for improper supervision.

466. Plaintiff was placed on central registry for a third time.

467. Again, Plaintiff sought an expunction of the substantiation and central registry placement.

468. And again, it was determined there was no preponderance of the evidence for the substantiation.

469. For a third time the substantiation was reversed and Plaintiff was removed from central registry.

470. Not surprisingly, Defendant Desmarais was also a supervisor of Defendants Daniel Kuchan and Nicole Luster.

## VI.     Pattern of Abuse by Defendants

471.     Each and every allegation of the Complaint is incorporated as if fully set forth herein.

472.     After Plaintiff's second expunction, Defendant Luster failed to appear under subpoena in the Custody Case twice.

473.     Her failure to appear instigated numerous telephone calls and emails between Defendant Shackleton (her supervisor) and Plaintiff.

474.     Defendant Shackleton informed Plaintiff that Defendant Kuchan had prior complaints known to MDHHS in his employment history with MDHHS, including when he was with other counties prior to being transferred to Kent County.

475.     Defendant Shackleton also informed Plaintiff that Defendant Luster had prior complaints known to MDHHS in her employment history with MDHHS, including when she was with other counties prior to being transferred to Kent County.

476.     Defendant Shackleton also informed Plaintiff that MDHHS knew of prior employment issues related to Defendant Luster prior to hiring her.

477.     Defendant Shackleton apologized to Plaintiff for the first and second substantiations and stated "*this never would have happened to you if you were a mom*."

478.     Defendant Shackleton stated that it was clear Defendants Kuchan and Luster had tried to sabotage Plaintiff.

479.     Defendant Shackleton requested that Plaintiff provide MDHHS with copies of the testimony transcripts of Defendants Kuchan and Luster, Dr. McInnis and Ms. Hayes.  She also requested that Plaintiff provide MDHHS with transcript copies from the child welfare hearings in his second case.

480.     Each of those transcripts has been in the possession of MDHHS since 2018.

481.     Plaintiff provided them at his own expense.

482.     Defendant Shackleton stated she was going to launch an investigation into Defendant Luster because it resulted in the removal of the children from Plaintiff but that it was clear that Defendant Kuchan's investigation was equally in error.

483.     On May 1, 2018, Defendant Shackleton emailed:

*I'm pretty much finished but due to confidentiality, I'm not able to share with you the results of the investigation. I can say that the information I got from [Plaintiff] and the emails that [counsel] shared were extremely helpful in coming to my conclusion.*

*I heard that Mr. Tingley's custody hearing was finally resolved and that it was favorable to him. It's obvious to me that [his son and daughter] will benefit from being able to spend quality time with their father.*

484.     On May 23, 2018, Defendant Shackleton emailed:

*Thanks for getting back with me but [Plaintiff] may want to hold off until morning. [Defendant Lsuter] returned to work yesterday, my Supervisor and I informed her she was under investigation due to work performance issues and that I would be notifying her of the date and time of her investigatory interview. She didn't take it very well and I later saw her in a conference room with one of the union reps in the office. Then today she did not report to work at all and did not call in to me or [Defendant Kuzma]. So, if she doesn't show up tomorrow, I have to let our Labor Relations Rep know and she will send her an AWOL letter. I don't know the details of what's in the letter, but I presume they will give her a deadline to return or be terminated.*

*Please don't share this info. with anyone because I could get in big trouble for sharing. I thought it was important to tell you because of how she treated you and to alleviate the time and effort of you writing up your statement for nothing if she doesn't show up to work again tomorrow. Part of me hopes she does return because I've put in a ton of hours in this investigation and I want to see her receive consequences for what she's done. I can safely say that in my almost 32 years in child welfare, I'm certain that no one had lied to me more.*

*I will send you an email in the morning to let you know whether she returned to work.*

485.     On May 24, 2018, Defendant Shackleton emailed:

*[Plaintiff's] case was my main focus in this investigation, but I do have other cases and work performance issues to address in my write up to Labor Relations, which is another reason why I don't want you to get into every grievance you had in regards to [Defendant Luster] and how she handled your case. If Labor Relations thinks I piled on too much in regards to your case, they might ignore the rest of the cases and issues I'm bringing forward. I say all of this based on my almost 25 yrs. experience.*

486.     On June 22, 2018, Defendant Shackleton emailed:

*In one of the parenting time motion hearings I reviewed, I recall the Judge asking [counsel] to distribute the letters to the court and I would assume since [Defendant Luster] was in attendance, she would have received copies too. I just need to prove that she received them but failed to acknowledge them to the court in her USP's or court reports, as another means of sabotaging [Plaintiff's] case with his children.*

487.     She also emailed that day:

*I understand [Plaintiff's] frustration that this is taking so long, but this is a very lengthy process and I don't want to turn my packet in until I've uncovered every stone. I'm not sure if I told you in my previous email, but [Defendant Luster is] now making false accusations about me. She stated at the end of her interview last week that I admired her work and did not have any issues with her until sometime in 2016 when a "compromising situation" occurred between the two of us. With no surprise, she would not explain what exactly happened. She's just making crap up! I actually think she's going to claim that I made a pass at her and she didn't reciprocate, so I started writing her up at that point. It's pathological!*

488.     On July 19, 2018, Defendant Shackleton emailed:

*[Defendant Luster is] back doing investigations and she is causing trouble once again. [Defendant Desmarais] is already having issues with her and I know she is desperately hoping for the same result as I am.*

489.     On August 20, 2018, Defendant Shackleton sent Plaintiff the following

email:

*I wanted to let you know that we finally got to the outcome we wanted in regards to [Defendant Luster]. After submitting my 439 page disciplinary packet, Labor Relations recommended dismissal. Her and the UAW Rep were provided with the packet and a disciplinary conference was scheduled for the following week. Prior to the conference, she went out on medical leave again. Lansing denied her medical leave because she had used up all of her FMLA and union time prior to returning in May. Therefore, she was put on a medical layoff, which means she is no longer a state employee. She can try to put her name back on the recall list within the two years, but when/if she does, it will be flagged to Labor Relations and they will complete the dismissal that I started. The bottom line is she has no chance of coming back to DHHS or any other state agency.*

*Please keep this confidential because I could get in a lot of trouble sharing this information, but it seems to me that you deserve to know of the final outcome. It would be greatly appreciated if you would delete this email after you read it.*

490.     Defendant Shackleton sent each of these emails from her MDHHS email account.

491.     The Defendants knowledge is summarized, in part, in an MDHHS internal investigation report of Defendant Luster that is more than 438-pages long.

492.     The investigation report concluded multiple incidences of wrongdoing by Defendant Luster before, during and after her employment with MDHHS and involvement with Plaintiff's family.


## VII.     MiSACWIS.

493.     Each and every allegation of the Complaint is incorporated as if fully set forth herein.

494.     As a result of serious systemic deficiencies that have been known to Defendants for many years, the Michigan child welfare system and MiSACWIS has inflicted numerous harms on Plaintiff.

495.     Federal scrutiny of MDHHS dates back to 2006, when the nonprofit group Children's Rights sued the State of Michigan over its deficiencies in *Dwayne B. v Granholm*, during the former Governor Jennifer Granholm administration. MDHHS settled with Children's Rights in 2008, leading to the current federal monitoring system, later revised in *Dwayne B. v Snyder*.

496.     MDHHS has continued to receive negative reports in its continuing federal audits and investigations under the prior settlement agreement.

497.     *Dwayne B. v Granholm* and *Dwayne B. v Snyder* both involved a class of plaintiffs who were children in Michigan's child welfare system.

498.     There has been no class action settlement related to parents harmed by Michigan's child welfare system.

499.     Defendants knew or were in a position to know that MiSACWIS was insufficient to safeguard the civil rights of Michigan parents, including Plaintiff.

500.     More than half of MDHHS respondents to an MDHHS-sponsored survey said that they were unable to correct information that was entered into MiSACWIS incorrectly; and almost two-thirds reported that information entered into MiSACWIS was not saved at all.

501.     In March 2019, MDHHS stated "*we know MiSACWIS has major problems.*"

502.     On March 14, 2019, Governor Gretchen Whitmer stated, "*we are going to fix [MiSACWIS]. I am confident [Defendant Robert Gordon] is the man to do it. It's incredibly frustrating for taxpayers, for me. But most importantly, very worrisome for kids who need protection the most.*"

503. Three months later MiSACWIS was still causing injury to Plaintiff, and six months later Defendant Scott Orr was still blaming MiSACWIS for the continuing violations of Plaintiff's civil rights.

504. In a letter to Plaintiff dated September 17, 2019, Defendant Orr indicated that a "help ticket" was generated to correct the substantiation reversals in MiSACWIS.

505. Defendants have known of the systemic problems with MiSACWIS since before ever engaging with Plaintiff.

506. A backlog of help tickets had already escalated from 895 in 2015, to 3,670 in 2017.

507. Former federal Department of Health and Human Services analyst Kurt Heisler, found that MiSACWIS suffers from "an unmanageable backlog" that "negatively affect[s] outcomes for children and families."

508. This duty is placed upon Defendants Gordon, McCall and Cheung to guarantee policies, systems and practices that will safeguard Plaintiff's civil rights and the civil rights of all parents and children in Michigan.

509. Defendants Gordon, McCall and Cheung recklessly and/or knowingly violated provisions of federal statutes that are unambiguous, intended to protect families and children, and mandatory, as well as the state laws and policies that implement the federal requirements and provide a presumptively constitutional plan that balances the need to protect abused or neglected children against the constitutional rights of families.

510. Defendants Gordon, McCall, and Cheung were indifferent to those duties and the defects in MiSACWIS because instead of mitigating the risk of harm caused by

the defective system, they worried about the budgetary, contractual, and political implications that would arise from correcting it.

511.    Defendants Fountain, Selden-Johnson, and Orr have an ongoing, supervisory duty over Kent County - MDHHS and the proper operations of MiSACWIS in their roles as the administrative staff and custodians of Kent County - MDHHS to guarantee policies, systems and practices that would have safeguarded Plaintiff's civil rights and the civil rights of all parents in Kent County.  This includes an ongoing duty to assess compliance with unambiguous federal statutes, as well as the state laws and policies that implement those requirements.

512.    Defendants Fountain, Selden-Johnson, and Orr were indifferent to those duties and the defects in MiSACWIS because instead of mitigating the risk of harm caused by the defective system, they worried about the budgetary, contractual, hierarchical and political implications that would arise from correcting it.


## VIII.    *Additional Facts.*

513.    MDHHS mandates that a parent be placed upon central registry when substantiated for certain, alleged conduct that rises to a threat level.

514.    In so doing, MDHHS established a substantive predicate mandating central registry placement when relevant criteria have been met.

515.    Defendants Gordon, McCall, and Cheung are responsible for establishing such relevant criteria and policies mandating such outcome.

516.    Disparate treatment because someone is a father rather than a mother is, in fact, disparate treatment based upon gender.

517.     Defendant Kuchan was not acting, nor could he have reasonably believed he was acting within the scope of his authority by treating Plaintiff differently than the mother based upon gender.

518.     Defendant Bolden was not acting, nor could she have reasonably believed she was acting within the scope of her authority by treating Plaintiff differently than the mother based upon gender.

519.     Defendant Luster was not acting, nor could she have reasonably believed she was acting within the scope of her authority by treating Plaintiff differently than the mother based upon gender.

520.     Defendant Shackleton was not acting, nor could she have reasonably believed she was acting within the scope of her authority by treating Plaintiff differently than the mother based upon gender.

521.     Defendant Williams was not acting, nor could she have reasonably believed she was acting within the scope of her authority by treating Plaintiff differently than the mother based upon gender.

522.     Defendant Desmarais was not acting, nor could she have reasonably believed she was acting within the scope of her authority by treating Plaintiff differently than the mother based upon gender.

523.     Defendant Kuchan was not acting, nor could he have reasonably believed he was acting within the scope of his authority by ignoring well established MDHHS investigative policies.

524.     Defendant Bolden was not acting, nor could she have reasonably believed she was acting within the scope of her authority by ignoring well established MDHHS investigative policies.

525.     Defendant Luster was not acting, nor could she have reasonably believed she was acting within the scope of her authority by ignoring well established MDHHS investigative policies.

526.     Defendant Shackleton was not acting, nor could she have reasonably believed she was acting within the scope of her authority by ignoring well established MDHHS investigative policies.

527.     Defendant Williams was not acting, nor could she have reasonably believed she was acting within the scope of her authority by ignoring well established MDHHS investigative policies.

528.     Defendant Desmarais was not acting, nor could she have reasonably believed she was acting within the scope of her authority by ignoring well established MDHHS investigative policies.

529.     Kent County -- MDHHS has delegated supervised parenting time services to third party, non-governmental agencies.

530.      Kent County -- MDHHS has delegated foster care services to third party, non-governmental agencies.

531.     Such delegation includes Defendant YWCA as a third party, non-governmental agency.

532.     Accordingly, the YWCA is engaged in the exercise or discharge of a governmental function. Defendants Fountain, Selden-Johnson, and Orr have an ongoing,

supervisory duty over Defendants Bolden, Kuzma, Shackleton, Kuchan, Luster, Williams and Desmarais.  This includes an ongoing duty to assess their performance and compliance with unambiguous federal statutes, as well as the state laws and manuals that implement those requirements.

533.     Defendants Fountain, Selden-Johnson, and Orr recklessly and/or knowingly violated provisions of the federal and Michigan statutes, and MDHHS policies, that are unambiguous, intended to protect families and children, and mandatory.

534.     Defendants Fountain, Selden-Johnson, and Orr were indifferent to those duties and the performance of their subordinates because instead of mitigating the risk of harm caused by their subordinates, they worried about the budgetary, contractual, union, and political implications that would arise from correcting it.

535.     Defendants Bolden, Kuzma, Shackleton and Desmarais have or had an ongoing, supervisory duty over Defendants Kuchan, Luster and Williams.  This includes an ongoing duty to assess their performance and compliance with unambiguous federal statutes, as well as the state laws and MDHHS policies that implement those requirements.

536.     Defendants Bolden, Kuzma, Shackleton and Desmarais recklessly and/or knowingly violated provisions of the federal and Michigan statutes, and MDHHS policies, that are unambiguous, intended to protect families and children, and mandatory.

537.     Defendants Bolden, Kuzma, Shackleton and Desmarais were indifferent to those duties and the performance of their subordinates because instead of mitigating the risk of harm caused by their subordinates, they worried about the budgetary, contractual, union, and political implications that would arise from correcting it.

538.     Defendants YWCA West Central Michigan and Paulson recklessly and/or knowingly violated provisions of federal and Michigan statutes, MDHHS policies, and their own internal policies based upon these other mandates, that are unambiguous, intended to protect families and children, and mandatory.

539.     Defendants YWCA West Central Michigan and Paulson were indifferent to those duties because instead of mitigating the risk of harm caused by their acts, they worried about the budgetary, contractual, and political implications that would arise from correcting it.

540.     Defendants Fountain, Selden-Johnson, and Orr have an ongoing, supervisory duty over their agents and/or contractors Defendants YWCA West Central Michigan and Paulson. This includes an ongoing duty to assess their performance and compliance with unambiguous federal and Michigan statutes, and MDHHS policies, that are unambiguous, intended to protect families and children, and mandatory.

541.     Defendants Fountain, Selden-Johnson, and Orr were indifferent to those duties and the performance of their agents because instead of mitigating the risk of harm caused by their agents, they worried about the budgetary, contractual, and political implications that would arise from correcting it.

542.     While not every violation of these statutes and regulations constitutes a civil rights violation, these statutes and regulations gave Defendants ample notice on the likely illegality of their actions.

543.     At all times, each of the Defendants acted under color of law by virtue of being an employee, division, or an agent/contract agency of MDHHS and Kent County – MDHHS.

544.     As a result of Defendants' conduct, Plaintiff has been harmed and deprived of both federal and state-created liberty or property rights without due process of law in violation of his constitutional rights.

545.     Given Defendants' repeated and uninterrupted misconduct toward Plaintiff – which each time resulted in administrative vindication for Plaintiff – qualified immunity cannot shield Defendants' actions as simply mistaken interpretations of law and constitutional protections.

546.     Plaintiff has a justifiable and actual fear of continuing to be targeted by Defendants and having his constitutional rights and his relationships with his children harmed. With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

547.     Plaintiff will incur future expenses for administrative, legal, lost work, emotional duress, and medical treatment and, as a result, seek payment of the related expenses as an element of the consequential damages.

548.     The degree of probability that the Plaintiff will continue to be targeted is such that there is a reasonable certainty that such expenses will arise at some future date, thus entitling Plaintiff to recover from Defendants for apprehended consequences that are not presently manifested.

549.     A rational basis exists between Plaintiff's exposure to the acts by Defendants described herein, and Plaintiff's currently manifested fear of continuing to be targeted in the future.

# <u>LEGAL CLAIMS</u>

550.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

## COUNT 1:

<u>Defendants' actions violated Plaintiff's
Constitutional Right To Parent</u>

551.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

552.     Plaintiff had and has a fundamental, Constitutional right to make decisions concerning the care, custody, and control of his children. *Meyer v Nebraska*, 262 US 390, 399-400; 43 S Ct 625; 67 L Ed 1042 (1923).

553.     Defendants individually and jointly violated Plaintiff's Constitutional rights to parent.

## COUNT 2:

<u>Defendants Kuchan, Luster, Williams, Bolden, Shackleton,
Kuzma, Desmarais, Novosad, Orr, Fountain,
Selden-Johnson, YWCA and Paulson's actions violated the Plaintiff's
14th Amendment right to procedural and substantive due process</u>

554.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

555.     Defendants Kuchan, Luster, Williams, Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, and Selden-Johnson treated Plaintiff disparately.

556.     These Defendants turned a blind eye to the acts of the mother, despite all of her history, the reports of the children, and the reports of the professionals.

557.     These Defendants then targeted and falsely substantiated Plaintiff.

558.     Such investigations and substantiations were arbitrary and capricious.

559.     Each substantiation was ultimately expunged, further evidencing there was no rational basis for these Defendants' treatment of Plaintiff.

560.     These Defendants intentionally applied different and ambiguous parenting time rules to Plaintiff.

561.     These Defendants intentionally refused to provide parenting time reports despite their own policy to do so.

562.     These Defendants then intentionally mischaracterized parenting time reports that otherwise reflected positive parenting time sessions.

563.     Such acts, rules and reports were arbitrary and capricious.

564.     These Defendants knowingly submitted false or misleading facts, law and policies to the trial court and the Kent County prosecutor during the course of investigations and court proceedings that directly caused the courts and prosecuting authority to take errant action and erroneously make findings of fact and law contrary to Plaintiff.

565.     These Defendants placed Plaintiff on Central Registry – on three separate occasions – which caused a stigma and jeopardized his abilities to participate in coaching, school, 4H and other activities with his children, and also jeopardized employment opportunities.

566.     These Defendants selectively targeted Plaintiff.

567.     Defendant Shackleton stated that Plaintiff would not have been targeted if he was a mom, rather than a dad.

568.     Such distinction is based upon gender, a suspect class.

## COUNT 3:

<u>Defendants Gordon, McCall,
and Cheung's actions violated the Plaintiff's
14th Amendment right to procedural and substantive due process</u>

569.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

570.     Defendants Gordon, McCall, and Cheung deprived Plaintiff of his substantive due process right to be free from the infliction of unnecessary harm, and violated his Constitutional right to parent.

571.     Defendants Gordon, McCall, and Cheung knew of and disregarded the excessive risk caused by MiSACWIS.

572.     Defendants Gordon, McCall, and Cheung failed to correct the excessive risk caused by MiSACWIS despite their knowledge.

573.     These Defendants were preoccupied with the political and budgetary concerns of correcting MiSACWIS, rather than the risk MiSACWIS posed.

574.     Defendants Gordon, McCall, and Cheung were deliberately indifferent to the risk of such injury.

575.     Their acts, or failures to act, with respect to MiSACWIS substantially and seriously injured Plaintiff emotionally, financially, and physically.

## COUNT 4:

<u>Defendants Luster and Paulson's actions violated Plaintiff's
1st Amendment rights.</u>

576.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

577.     Plaintiff was engaged in protected speech and conduct when communicating with his children, and/or Defendant YWCA staff, during supervised parenting time.

578.     Defendants Luster and Paulson took action against Plaintiff, through arbitrary, capricious, and secretive parenting time rules that deterred Plaintiff from such speech and conduct.

579.     Defendant Luster and Paulson did not want Plaintiff to engage in such speech or conduct because it exposed their own abuses and incompetency.

## COUNT 5:

### Defendants Kuchan, Luster, Williams, Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, and Selden-Johnson actions violated Plaintiff's 1st Amendment rights.

580.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

581.     Plaintiff was engaged in protected speech and conduct when communicating with Defendants Kuchan, Luster, Williams, Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, and Selden-Johnson; which included numerous communications to them and providing recordings, documents, and photographs.

582.     Plaintiff was engaged in protected speech and conduct when he involved the Ombudsman.

583.     Plaintiff was engaged in protected speech and conduct when he made each of his expunction requests.

584.     Plaintiff was engaged in protected speech and conduct when he spoke out at the district court arraignment hearing.

585.     Plaintiff was engaged in protected speech and conduct when he sought assistance from the Kentwood Police Department.

586.     These Defendants did not want Plaintiff to engage in such speech or conduct because it exposed their own abuses and incompetency.

587.     These Defendants retaliated against Plaintiff by chastising him, telling him not to send information, telling him they would not review the information, telling him his information was false, and retaliating against him with their own investigations into Plaintiff.

588.     Their conduct deterred Plaintiff from such speech and conduct.


COUNT 6:

Defendants Kuchan, Luster, Williams Bolden, Shackleton,
Kuzma, Desmarais, Novosad, Orr, Fountain,
Selden-Johnson, YWCA and Paulson's actions constituted a
broad-based conspiracy to violate the Plaintiff's civil rights

589.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

590.     Given these Defendants' broad-ranging accusations and failures against Plaintiff it is not possible to justify these Defendants' actions as simply mistaken interpretations of law or as individual acts.

591.     Instead, these Defendants repeatedly did whatever it took to create a case against Plaintiff, in the absence of rational belief or probable cause.

592.     Such efforts constitute a conspiracy under 42 U.S.C. § 1983.

## COUNT 7:
### 42 U.S.C. § 1985

593.    Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

594.    Defendants Kuchan, Luster, Williams, Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, Selden-Johnson, YWCA and Paulson entered the conspiracy for the purpose of depriving, either directly or indirectly, Plaintiff of the equal protection of the laws.

595.    Each of these Defendants shared a common discriminatory objective.

596.    Defendant Shackleton stated that conduct against Plaintiff occurred because he was the father and not the mother.

597.    Gender is a protected class under the Equal Protection Clause for purposes of 42 U.S.C. § 1985.

## COUNT 8:

### Defendants Gordon, McCall, and Cheung Gross Negligence

598.    Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

599.    Defendants Gordon, McCall, and Cheung, and each of them individually, breached their duty of reasonable care which a reasonably prudent person should use under the circumstances, by failing to correct MiSACWIS.

600.    Defendants Gordon, McCall, and Cheung were indifferent to those duties and the defects in MiSACWIS.

601.     Defendants Gordon, McCall, and Cheung, as owner and/or operator of MiSACWIS, owed Plaintiff a cognizable duty to exercise reasonable care in accurately reporting information related to Plaintiff.

602.     These Defendants demonstrated a substantial lack of concern as to whether injury would occur to Plaintiff as a result of Defendants acts, or failures to act, regarding MiSACWIS.

603.     These Defendants, and each of them individually, gross negligently, recklessly, willfully, wantonly, and/or intentionally created the immediate and continuing harm caused by MiSACWIS.

604.     Furthermore, these Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any errors with MiSACWIS after they occurred.

605.     Defendants Gordon, McCall, and Cheung's breaches of their duties were direct and proximate causes of Plaintiff's damages and the imminent, substantial and impending harm to Plaintiff.


COUNT 9:

Defendants Williams and
Desmarais Gross Negligence

606.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

607.     Defendants Williams and Desmarais, and each of them individually, breached their duty of reasonable care which a reasonably prudent person should use

under the circumstances, by failing to properly investigate Plaintiff in the Summer of 2019.

608.     Defendants Williams and Desmarais were indifferent to those duties and the defects in their investigation.

609.     Defendants Williams and Desmarais owed Plaintiff a cognizable duty to exercise reasonable care in accurately investigating information related to Plaintiff.

610.     These Defendants demonstrated a substantial lack of concern as to whether injury would occur to Plaintiff as a result of these Defendants acts, or failures to act, regarding their investigation.

611.     These Defendants, and each of them individually, gross negligently, recklessly, willfully, wantonly, and/or intentionally created harm caused to Plaintiff by their investigation.

612.     Furthermore, these Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any errors in their investigation after they occurred.

613.     Defendants Williams and Desmarais's breaches of their duties were direct and proximate causes of Plaintiff's damages and the imminent, substantial and impending harm to Plaintiff.

COUNT 10:

Defendants Williams and Desmarais
Intentional Infliction of Emotional Distress

614.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

615.     Defendants Williams and Desmarais, and each of them individually, breached their duty of reasonable care which a reasonably prudent person should use under the circumstances, by failing to properly investigate Plaintiff in the Summer of 2019.

616.     Defendants Williams and Desmarais were indifferent to those duties and the defects in their investigation.

617.     Defendants Williams and Desmarais owed Plaintiff a cognizable duty to exercise reasonable care in accurately investigating information related to Plaintiff.

618.     These Defendants demonstrated a substantial lack of concern as to whether injury would occur to Plaintiff as a result of these Defendants acts, or failures to act, regarding their investigation.

619.     These Defendants, and each of them individually, gross negligently, recklessly, willfully, wantonly, and/or intentionally created harm caused to Plaintiff by their investigation.

620.     Furthermore, these Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any errors in their investigation after they occurred.

621.     Defendants Williams and Desmarais's breaches of their duties were direct and proximate causes of Plaintiff's damages and the imminent, substantial and impending harm to Plaintiff.

622.     Defendants Williams and Desmarais's threat to substantiate Plaintiff and remove his children if he refused to take a drug screen was extreme and outrageous conduct.

Defendants Bolden, Shackleton, Kuzma,
Desmarais, Novosad, Orr, Fountain,
and Selden-Johnson, Failure to Supervise

623.     Each and every allegation of the Complaint is incorporated as if fully set forth for each count and legal claim.

624.     Defendants Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, and Selden-Johnson failed to properly supervise Defendants Kuchan, Luster and Williams.

625.     Defendants Bolden, Shackleton, Kuzma, Desmarais, Novosad, Orr, Fountain, and Selden-Johnson instituted or instructed official Kent County – MDHHS policies or customs that were contrary to federal and state law, MDHHS policies, and recognized best practice.

626.     Such policies and customs directly caused harm to Plaintiff.

627.     The policy and custom of not properly following the forensic protocol directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights .

628.     The policy and custom of destroying investigative notes and evidence directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

629.     The policy and custom of not properly following the policy for substantiating mental injury and threatened harm directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights .

630.     The policy and custom of not properly following the policy for requesting an "on inquiry" petition authorization directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

631.     The policy and custom of not properly following the policy for requesting supervised parenting time directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

632.     The policy and custom of not properly following the policy for requesting a drug screen directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

633.     The policy and custom of not properly following the policy for substantiating failure to supervise directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

634.     The policy and custom of not properly following the policies for hiring, investigating, and discipling Defendants Kuchan and Luster directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

635.     The policy and custom of not properly following the policies for collateral contacts directly harmed Plaintiff in the investigation and substantiations against him, and violation of his constitutional rights.

636.     These Defendants had more than just a right and duty to control Defendants Luster, Kuchan and Williams.

637.     These Defendants provided policies and training, and permitted a county office culture, that specifically directed or promoted the foregoing violations of Plaintiff's constitutional rights.

638.     These Defendants adopted such policies and customs intentionally and knowingly.

639.     These Defendants adopted such policies and customs for the convenience and priorities of their own county office, with reckless disregard for the injury it was cause to Plaintiff's constitutional rights.

## REQUESTED RELIEF

The above counts constitute separate violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1985.  They also constitute state law tort claims.  For each of these violations, Plaintiff Troy William Tingley seeks to recover the following:

1.     General damages in an amount to be determined by a jury;

2.     Compensatory damages in an amount to be determined by a jury;

3.     Punitive damages in an amount to be determined by a jury;

4.     Reasonable attorney and expert fees pursuant to 42 U.S.C. § 1988;

5.     Any further relief that may be appropriate.

## JURY DEMAND

Each of Plaintiff's actions are triable before a jury, and he hereby makes his demand for jury trial.

Dated: July 31, 2020.                    s/ Christopher M. Wirth (P70174)
                                         CORE LEGAL PLC
                                         250 Monroe Avenue NW, Suite 400
                                         Grand Rapids, MI 49503
                                         (616) 855-2145